# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3631-17

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

J.L.G.,[1]

     Defendant-Appellant.

_____

Argued January 25, 2021 – Decided July 30, 2021

Before Judges Currier and Gooden Brown.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Indictment No. 14-09-1098.

Rochelle Watson, Deputy Public Defender II, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Rochelle Watson, of counsel and on the brief).

Joie D. Piderit, Assistant Prosecutor, argued the cause for respondent (Yolanda Ciccone, Middlesex County

---

[1] We use initials to protect the confidentiality of the victims. R. 1:38-3(c)(12).

Prosecutor, attorney; Joie D. Piderit, of counsel and on the brief).

PER CURIAM

Following a jury trial, defendant, an armed security guard, was convicted of second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a) (count seven); second-degree endangering the welfare of a child, namely, his son, J.G., N.J.S.A. 2C:24-4(a) (count four); third-degree terroristic threats against J.G., N.J.S.A. 2C:12-3(a) (count six); fourth-degree aggravated assault by pointing a firearm at J.G., N.J.S.A. 2C:12-1(b)(4) (count one); and simple assault upon his wife, D.G., a disorderly persons offense, N.J.S.A. 2C:12-1(a)(3) (a lesser included offense of count three). Defendant was sentenced to an aggregate term of five years' imprisonment with a three-and-one-half-year period of parole ineligibility.

The charges stemmed from a domestic dispute with defendant's teenage son, J.G., that began when J.G. interceded in an altercation between defendant and his wife, D.G., J.G.'s step-mother. Following the initial altercation, defendant threatened to kill J.G. and others, retrieved a loaded .38 caliber revolver from his upstairs bedroom closet, and resumed fighting with his wife while armed with the gun in the presence of A.G., defendant's other son and J.G.'s three-year-old half-brother. When defendant returned upstairs where J.G.

2

had remained, he pointed the gun at J.G., shoving the barrel against J.G.'s cheek, before returning the gun to his closet and falling asleep.

On appeal, defendant raises the following points for our consideration:

> POINT I:
>
> THE TRIAL COURT ERRED IN ADMITTING [J.G.'S] PRIOR CONSISTENT STATEMENT AS IT WAS MADE WHEN HIS MOTIVE TO FABRICATE WAS MOST ACUTE AND IT WAS NOT PROBATIVE OF HIS CREDIBILITY; COMPOUNDING THE PREJUDICE, THE PRIOR STATEMENT INJECTED N.J.R.E. 404(A) AND (B) EVIDENCE THAT DEFENDANT WAS A DRUNKEN DOMESTIC ABUSER INTO [THE] TRIAL
>
> > A. [J.G.'S] Prior Consistent Statement Lacked Probative Value And Should Have Been Excluded.
> >
> > B. Alternatively, The Prior Consistent Statement Should Have Been Sanitized To Omit Reference To Defendant's Excessive Alcohol Consumption And Prior Instances Of Domestic Violence. (Not Raised Below).
>
> POINT II:
>
> WHERE THE TRIAL JUDGE RULED THAT A.G.'S PRIOR INCONSISTENT STATEMENT WAS UNRELIABLE AND INADMISSIBLE, THE JUDGE ERRED IN ADMITTING A PORTION OF THE PRIOR INCONSISTENT STATEMENT – ON THE CRITICAL ISSUE – INTO EVIDENCE.

3

POINT III:

DEFENDANT WAS DEPRIVED OF A FAIR TRIAL BASED ON TWO INSTANCES OF PROSECUTORIAL MISCONDUCT: THE PROSECUTOR ACCUSED DEFENDANT OF WITNESS TAMPERING AND BOLSTERED THE CREDIBILITY OF THE SOLE INCULPATORY WITNESS.

Because we agree that J.G.'s prior consistent statement should have been excluded, we reverse.

I.

We glean these facts from the four-day trial, that began on February 28, 2017, during which J.G., born July 1998, was the State's principal witness. J.G. testified that due to a troubled relationship with his birth mother, M.S., at the end of 2013, he moved in with defendant, his birth father; D.G., his stepmother; and A.G., his half-brother. J.G. described his troubled relationship with M.S. as him "being a rebellious teen at the time, just hardheaded, didn't really want to listen to her."

J.G. testified that after moving in with his father, on the morning of June 7, 2014, he awoke to "commotion" coming from downstairs. J.G. stated his stepmother and father were "[a]rguing" loud enough to wake him up. Once he was awake, J.G. proceeded to get ready for A.G.'s fourth birthday party that was

scheduled for later in the day. While J.G. was getting ready, he was "summoned downstairs" by his stepmother in a "worried voice." When J.G. went downstairs to the living room, he saw his father "pretty close to the couch where [his step-mother] was sitting." After inquiring "what's going on" and receiving no response, J.G. returned upstairs to his bedroom. Once upstairs, J.G. was called by his stepmother a second time but "louder" and "more demanding." Fearing that "something [was] . . . wrong," J.G. "ran downstairs as fast as [he] could" and observed defendant holding his stepmother's "wrists" with one hand while "his other hand was balled up into a fist."

J.G. immediately "got in-between them" and gave defendant a "bear hug" to try to "restrain him." J.G. "believe[d]" he detected the smell of alcohol on defendant's breath and indicated that defendant became "aggressive" "when he [was] drunk." J.G. then implored defendant to "calm down" because his younger brother was in the living room witnessing the altercation. In response, defendant became "emotional and cried on [J.G.'s] shoulder" while whispering "I'm going to kill all you . . . motherfuckers."

After J.G. "loosened [his] grip" and defendant extricated himself, defendant went upstairs to his bedroom while J.G. followed. Once inside his bedroom, J.G. observed defendant "take his work gun out of [its] holster," which

5

"was attached to [defendant's] work belt . . . on the floor."[2]  J.G. described the gun as a "black revolver."  After J.G.'s efforts to "restrain [defendant] again" and persuade him to "put [the gun] away" failed, "[defendant] went back downstairs" while J.G. "sat on the top of the stairs . . . . traumatized" and "crying."  Although J.G. could not see into the living room from his vantage point, he heard his stepmother say "get that gun out of my face."  J.G. also heard his stepmother say "he didn't need to be seeing this," referring to his brother, A.G.  J.G. then heard "a smack[,] . . . [k]inda like a facial smack."

Thereafter, according to J.G., defendant "made his way back upstairs." When defendant reached J.G. on the stairs, defendant placed "the barrel of the gun to [his] cheek and then . . . put [the gun] in [J.G.'s] hand."  J.G. explained that "[he] could feel [the gun] pushing against [his] braces."  After showing J.G. that the gun "was loaded," defendant taunted J.G., telling him "you have the power now."  When J.G. refused to accede to defendant's taunt and "point [the] gun at [defendant]," defendant told J.G. that he "had no balls as a man," "took the gun away from [J.G.]," and "made his way back to his [bed]room."

_____

[2]  Defendant carried a firearm for his job providing security for various federal facilities.

A-3631-17

According to J.G., as defendant walked away, defendant kicked him slightly in the "[l]ower back."

After the incident, J.G. called his mother on his cellphone. He told her what had occurred and told her that he wanted to come home. J.G.'s mother directed him to gather his belongings while she made arrangements to pick him up. Meanwhile, J.G. attended A.G.'s birthday party at a nearby bowling alley with his stepmother. Defendant did not attend the party. During the car ride to the party, J.G.'s stepmother instructed him to "keep [his] mouth shut about [the incident]."

While J.G. was at the party, his mother contacted her sister, who lived closer to defendant's residence in Perth Amboy, and arranged for her to pick up J.G. Ultimately, J.G.'s aunt picked him up after he returned to defendant's home following A.G.'s birthday party and brought him to her house to await his mother's arrival. Upon arrival, J.G.'s mother took J.G. to the Perth Amboy Police Department where he gave a recorded statement to police.

On cross-examination, J.G. was asked whether he reported the incident on the same day that defendant had informed him that he would be attending a scholastic program at Kean University called Adelante four days a week during the summertime. J.G. acknowledged that he had been attending the program on

7

A-3631-17

Saturdays only and resisted attending four days a week but could not recall when defendant told him about the expanded attendance schedule. J.G. denied the implication that he fabricated the story about his father so that he could return to his mother's house in South Jersey and avoid the more regimented summer schedule his father had planned for him.

Defendant was arrested without incident at his home early the following morning, June 8, 2014. After consenting to a search of his home, police recovered three lawfully owned firearms in his bedroom, namely, a .38 caliber black Taurus revolver, a .38 caliber silver Taurus revolver, and a black Smith & Wesson nine-millimeter handgun. The black Taurus was found in defendant's "duty belt, in the holster, underneath his work clothes on the floor of the closet." The silver Taurus was found "in a cardboard box in [a] plastic container" and the Smith & Wesson was found "in [a locked] lock box." Subsequent ballistics testing revealed that all three firearms were operable.

During the trial, in addition to J.G., law enforcement witnesses, and caseworkers from the Division of Child Protection and Permanency (DCPP), the State produced J.G.'s mother, J.G.'s stepmother, and J.G.'s half-brother. J.G.'s mother, M.S., confirmed that she allowed J.G. to live with defendant in late 2013 because he was "being very rebellious." She attested that when she received the

A-3631-17

hysterical call from J.G. on June 7, 2014, she arranged with her sister to pick him up while she travelled from her home in South Jersey. When she arrived at her sister's home and found J.G. "scared" and "terrified," she took him to the Perth Amboy Police Department in the early morning hours of June 8, 2014, to report the incident. On cross-examination, M.S. acknowledged text messages she had sent to defendant in late December out of frustration in which she had described J.G. as a "[c]ompulsive liar" and stated that J.G. "lied so much that [she] didn't believe . . . an f'ing word out of his mouth." However, she testified that she believed J.G. when he called her crying and upset on June 7, 2014, because it was out of character for him to be that upset.

In contrast, J.G.'s stepmother, D.G., vehemently denied that anything happened on June 7, 2014, and testified that the incident was completely contrived by J.G. who "wanted to . . . return back home to his house where he[] apparently had very [lax] supervision." D.G. testified that after J.G. moved in, defendant "was very, very strict" about J.G.'s education and "enrolled [him] in [the] ROTC[3] program" in addition to Adelante. D.G. stated that just before J.G. reported the incident, defendant told J.G. that he would be attending Adelante full time in the summer and "[J.G.] said he wasn't going." According to D.G.,

_____

[3] The United States Army Reserve Officers' Training Corps.

the only argument that occurred on June 7 was related to J.G.'s "[poor] grades and . . . behavior."

D.G. also denied that she was "a victim [o]f domestic violence" despite the State producing a DCPP caseworker who responded to her home on June 9, 2014, and observed visible bruises on D.G.'s "face and chest area." D.G. testified that the bruises were caused by "an anemic condition" and a "fall" in a parking lot.[4] D.G. had also interjected herself during a DCPP caseworker's interview of A.G. the morning following the incident, June 8, 2014, when she indicated that A.G. did not see a gun on June 7 but had only seen defendant cleaning his gun on a prior occasion. D.G. also stated that A.G. did not see defendant hit her on June 7 but was confused by what he had seen in cartoons.[5]

---

[4] In contrast, D.G. had explained to the DCPP caseworker that the bruises were caused by A.G. "hit[ting] her with toys," because he was "very rambunctious."

[5] D.G. also denied the DCPP caseworker's account that there was evidence of excessive drinking in the home on the morning of June 8, 2014. D.G. testified that she and defendant each had "one drink" the day before on June 7. However, based on the caseworker's description of D.G. as being "disoriented" and having "slurred speech" when D.G. answered the door at about 7:00 a.m. on June 8, and D.G.'s ultimate admission to the caseworker that she had consumed alcohol, taken a sleeping pill, ingested prescription medication, and was "overwhelmed" in her caretaking role, A.G. was removed from the home and placed with his maternal grandparents. He was subsequently returned to his parents' care.

A-3631-17

A.G. testified that he recalled the police coming to his house and he recalled that J.G. and his mother were "crying." However, he stated that defendant did not have a gun but "had a [Maglite[6]] and [defendant] was just holding it." According to A.G., his mother told defendant to "[p]ut [the Maglite] . . . away" because "she thought . . . it was a gun." A.G. stated that he also thought it was a gun "[b]ecause it looked black like a gun," but he was mistaken. A.G. explained that he realized his mistake when defendant "showed it to [him] one day" and "it was a Maglite," not a gun. When probed, A.G. was unclear about when the discussion with defendant about the Maglite had occurred but agreed that it had occurred recently. A.G. also acknowledged that when he had previously come to court,[7] he had mistakenly stated that defendant "had a MegaBlaster, but he had a Maglite" instead.

Twelve days after the incident, on June 19, 2014, A.G. was interviewed by Nicole Ortiz, a forensic interview specialist with the Middlesex County Prosecutor's Office. Ortiz testified that during the course of the interview, A.G. never mentioned seeing his father with a Maglite or a flashlight.

---

[6] A.G. clarified that the Maglite "was just a flashlight."

[7] A.G. had previously come to court on August 24, 2016, for a competency hearing, after which a different judge ruled that A.G. was competent to testify.

When M.S. took J.G. to the Perth Amboy Police Department on the morning of June 8, 2014, he was interviewed by Sergeant Panagioti Boulieris, an officer with expertise in "matters involving juveniles." After administering the oath, Boulieris took a recorded statement from J.G., which statement was authenticated by Boulieris and played for the jury at trial. The statement was consistent with J.G.'s trial testimony.

Defendant's motion for a judgment of acquittal made at the close of the State's case, pursuant to Rule 3:18-1, was granted in part. The judge dismissed counts two[8] and five which charged defendant with fourth-degree aggravated assault and second-degree child endangerment, both pertaining to A.G. The remaining counts survived the motion.

Defendant produced two character witnesses, a former coworker and a childhood friend, both of whom testified about defendant's reputation for honesty and peacefulness in the community. Defendant also testified on his own behalf and denied J.G.'s account, describing it as "a false story" that was entirely "made up" by J.G. Defendant confirmed the circumstances under which J.G. came to live with him and reiterated M.S.'s characterization of J.G. as "always being a liar." Defendant testified that J.G. "started to lie to [him]" after moving

---

[8] The judge mistakenly referred to count three instead of count two.

A-3631-17

in with him. Defendant also confirmed that he enrolled J.G. in an ROTC program "to keep him on track" and "out of trouble," and enrolled him in Adelante "[t]o get him ahead" and "give him a fresh start" because his grades were "well below passing."

According to defendant, on June 7, 2014, the date of the alleged incident, he and D.G. sat J.G. down "to reprimand" him about a report they had received from J.G.'s school. During the discussion, defendant told J.G. that during the summer, he would be attending Adelante full time, which was from "Monday to Thursday." Defendant told J.G. that for the remaining days, he was "going to get a part-time job." Defendant testified that J.G. "was not too thrilled" and was resistant.

Regarding the alleged incident, defendant admitted that on the morning of June 7, he and D.G. each "had one drink"[9] but denied that they argued. Defendant specifically denied the allegations of domestic violence and testified that A.G. caused the bruises on D.G. because he was "very rough with [her]." Additionally, defendant vehemently denied pointing a gun at any member of his family. He explained that when A.G. testified that it was defendant who had

---

[9] Defendant testified that he did not "drink that much at all," and he did not "get aggressive even off of one drink."

made him realize that he had seen a Maglite rather than a gun, A.G. was referring to a prior conversation "[a] while back" during which he had "explained to [A.G.] what everything was on [his work] belt." Defendant stated that A.G. could not "differentiate time that well." Defendant acknowledged that he did not attend A.G.'s birthday party with the others but denied that he was passed out as a result of the altercation. Instead, he explained that he did not attend because "[he] had a migraine headache." According to defendant, the first time he became aware of the allegations was when police officers came to his house to arrest him.

In rebuttal, the State produced DCPP caseworker Lisa Androsko who responded to the home on June 9, 2014, after defendant was released. She testified that defendant told her that after returning home from work on June 6, 2014, he stayed in his car "relaxing" and did not enter his home until "around [10:00] a.m." the following morning, June 7, 2014. He said that when he went inside, his wife was questioning him about his whereabouts and the two argued. Defendant also told Androsko that he and his wife "were drinking . . . at 11:30 a.m." the morning of June 7. He specified that "he had two Bacardi and Sprite drinks, and his wife had three of the same drinks." According to Androsko, neither defendant nor D.G. mentioned Adelante.

14

This appeal followed defendant's convictions and sentence, which was memorialized in a December 22, 2017 judgment of conviction.

II.

In Point I, defendant argues that J.G.'s prior consistent statement was inadmissible under N.J.R.E. 803(a). Defendant asserts that "[b]ecause the case . . . hinged entirely on [J.G.'s] testimony and his prior consistent statement was the sole piece of evidence the jury asked to review during deliberations," its admission "was reversible error." Defendant continues that "even if the statement were admissible, the failure to sanitize the statement to redact references to defendant's drinking, aggressiveness, and penchant for domestic violence is an independent ground for reversal."

"[I]n reviewing a trial court's evidential ruling, an appellate court is limited to examining the decision for abuse of discretion." State v. Kuropchak, 221 N.J. 368, 385 (2015) (citation omitted). Under that standard, "[c]onsiderable latitude is afforded a trial court in determining whether to admit evidence," and "an appellate court should not substitute its own judgment for that of the trial court, unless 'the trial court's ruling was so wide of the mark that a manifest denial of justice resulted.'" Id. at 385-86 (alteration in original) (citations omitted).

A-3631-17

Here, after J.G. was cross-examined, the prosecutor sought to introduce J.G.'s prior recorded statement through Sergeant Boulieris "to rebut [the] claim that he fabricated" the incident. In support, the prosecutor asserted defense counsel "skillfully brought out the motive" that J.G. was lying because "he did [not] want to go to summer school for four days a week." Defense counsel objected, arguing he did not cross-examine J.G. on his prior statement and asserting that introducing the prior statement was unnecessary because he gave "the same exact statement" during his trial testimony. The trial judge overruled defense counsel's objection and admitted J.G.'s prior recorded statement to Sergeant Boulieris under N.J.R.E. 607 and 803 to rebut the accusation of "recent . . . fabrication or improper motive." The judge noted that J.G. was the State's "whole case" and an attack on his "truthfulness or honesty" "open[ed] the door."

Generally, "[a] prior consistent statement offered to bolster a witness' testimony is inadmissible." Palmisano v. Pear, 306 N.J. Super. 395, 402 (App. Div. 1997). "However, a prior statement may be admitted in evidence to support the credibility of a witness for the purpose of rebutting an expressed or implied charge of recent fabrication." Ibid. In that regard, Rule 607 provides in relevant

part[10] that "[a] prior consistent statement shall not be admitted to support the credibility of a witness except to rebut an express or implied charge against the witness of recent fabrication or of improper influence or motive and except as otherwise provided by the law of evidence."   Similarly, Rule 803(a)(2)[11] excludes from hearsay the prior statement of a witness that "is consistent with the witness' testimony and is offered to rebut an express or implied charge against the witness of recent fabrication or improper influence or motive."

"A 'charge' of recent fabrication can be effected through implication by the cross examiner as well as by direct accusation of the witness." State v. Johnson, 235 N.J. Super. 547, 555 (App. Div. 1989) (quoting State v. King, 115 N.J. Super. 140, 146 (App. Div. 1971)).  "Further, such a charge can be implied in the opening statement and confirmed by the closing argument." State v. Moorer, 448 N.J. Super. 94, 108 (App. Div. 2016).

"The scope of the [Rule 803(a)(2)] exception encompasses prior consistent statements made by the witness before the alleged 'improper influence or motive' to demonstrate that the witness did not change his or her story." Id.

---

[10] N.J.R.E. 607 has been amended since the trial occurred but will be referred to in this opinion as it existed at the time of the 2017 trial.

[11] N.J.R.E. 803(a) has been amended since the trial occurred but will be referred to in this opinion as it existed at the time of the 2017 trial.

at 110 (quoting <u>Neno v. Clinton</u>, 167 N.J. 573, 580 (2001)). Thus, in <u>Moorer</u>, we held that "fabrication is 'recent' if it post-dates a prior consistent statement." <u>Id.</u> at 110. In such a situation, "the prior consistent statement has clear probative value." <u>Id.</u> at 111. We explained:

> Impeachment by charging that the testimony is a recent fabrication or results from an improper influence or motive is, as a general matter, capable of direct and forceful refutation through introduction of out-of-court consistent statements that predate the alleged fabrication, influence, or motive. A consistent statement that predates the motive is a square rebuttal of the charge that the testimony was contrived as a consequence of that motive.
>
> [<u>Ibid.</u> (quoting <u>Tome v. U.S.</u>, 513 U.S. 150, 158 (1995)).]

In <u>Moorer</u>, the defendant challenged the admission of a detective's "prior consistent testimony concerning whether defendant took off his hat and threw it behind the couch." <u>Id.</u> at 106. The detective's report prepared the night of defendant's arrest did not mention the hat. <u>Ibid.</u> However, during his trial testimony, the detective testified about the hat and stated "he forgot to mention defendant's discarding the hat in his report." <u>Id.</u> at 106-07. After defense counsel implied that the detective accurately recorded the events when he wrote his report and recently fabricated a new version of events after reviewing another officer's report that mentioned the hat in preparation for trial, the

18

prosecutor moved to introduce the detective's prior consistent testimony from a prior proceeding "to rebut an implication of recent fabrication." Id. at 107. We determined that "[t]he trial court properly admitted [the detective's] prior testimony under Rule 803(a)(2)," and held that "[s]uch fabrication during trial or in preparation for trial is certainly 'recent' in common parlance." Id. at 108, 110.

In State v. Chew, 150 N.J. 30 (1997), "[o]ur Supreme Court has declined to adopt as a rigid admissibility requirement that the prior statement was made prior to the motive or influence to lie." State v. Muhammad, 359 N.J. Super. 361, 386 (App. Div. 2003) (citing Chew, 150 N.J. at 81). Recognizing that "many things were happening as the different stories unfolded," and that "[t]here were shades of difference between the witnesses' motivations at different times," the Chew Court upheld the admission of prior consistent statements given "the differing motives to fabricate" arising at different times. 150 N.J. at 80-81. The Court concluded that "[g]iven the relationship among the several statements," "[t]he prior consistent statements had significant 'probative force bearing on credibility beyond merely showing repetition.'" Id. at 81 (quoting United States v. Pierre, 781 F.2d 329, 333 (2d Cir. 1986)). Further, "defendant highlighted

19

numerous inconsistencies between the witnesses' statements, and between the different versions of the statements that the witnesses provided." Id. at 81.

Likewise, in Muhammad, we determined that a witness' prior consistent statement was properly admitted under Rule 803(a)(2), reasoning:

> As in Chew much was happening at the various times [the witness] made statements and testified, and his motivations likely differed at different times. The defense used the taped statement to impeach [the witness] by pointing out inconsistencies with his prior statements and his trial testimony. The statement was not irrelevant to rebut the charge that [the witness'] testimony was the product of an improper influence or motive to lie. As in Chew, it related to differing motives to fabricate and was used for rehabilitative purposes.
>
> [359 N.J. Super. at 389 (citing Chew, 150 N.J. at 81).]

In rendering our decision in Muhammad, we pointed out that:

> the purpose of [Rule] 803(a)(2) is best advanced by not requiring a strict temporal requirement, but instead allowing trial judges to evaluate relevance under all of the circumstances in which the prior statement is proffered. In reaching this conclusion we recognize that whether the statement was made before the asserted motive or influence to fabricate is a substantial factor in determining relevance. It is not, however, absolutely controlling. Where there are no factors other than the alleged improper influence or motive influencing the prior statement or its making, a post-motive statement should ordinarily be excluded.
>
> [Id. at 388.]

20

Applying these principles in this case, we are convinced that the court mistakenly exercised its discretion in admitting J.G.'s prior consistent statement. We note that while a temporal requirement is not controlling, it "is a substantial factor in determining relevance[,]" particularly where, as here, "there are no factors other than the alleged improper . . . motive influencing" the making of "the prior statement . . . ." Ibid. Based on the record, J.G.'s purported motive to lie, namely, to return to his mother's home and avoid attending Adelante full time in the summer which he would have been subjected to had he remained in his father's home, was present at the time he made the prior statement. Indeed, defendant admitted that he informed J.G. of the planned summer schedule to which J.G. objected on June 7, 2014. J.G. reported the incident to his mother the same day and to the police early the following morning.

Further, J.G.'s purported motivation to lie remained unchanged from the date he reported the incident to the date he testified at trial. No evidence was adduced, express or implied, of any differing or evolving motive to lie on the part of J.G. between the initial report, the prior statement, and trial. The fact that J.G. was removed from defendant's home by his mother when he reported the incident does not impact that analysis. See King, 115 N.J. Super. at 146-47 (admitting a witness's statement to police and grand jury testimony where

21

defense counsel alluded to the witness's threat a week before trial that she would lie at trial).

Critical to our decision is the fact that during cross-examination, defense counsel carefully avoided using the prior statement in any manner to undermine J.G.'s trial testimony. Counsel never pointed out that J.G. made no mention in his prior statement of defendant reprimanding him about school on June 7, 2014, and informing him about attending Adelante full time in the summer. See Johnson, 235 N.J. Super. at 555 (admitting a witness's prior statement after "defense counsel highlighted several inconsistencies in details between the prior statement and [the witness's] trial testimony, thus creating the inference that [he] had not been truthful at trial"). Given that the prior statement was made after the asserted motive to fabricate, that there are no additional factors in the record other than the alleged improper motive, and that defense counsel avoided cross-examining J.G. on the prior statement, we are satisfied that the overall circumstances militate in favor of exclusion.

However, our inquiry does not end there. We must next determine whether the admission of the prior statement "constitute[d] prejudicial error." Id. at 556. In that regard, we must determine whether the "evidence of guilt was so strong that the statement was not necessary to establish defendant's guilt, nor

22

was there any real possibility that the 'error led the jury to a result it otherwise might not have reached.'" Id. at 556 (quoting State v. Macon, 57 N.J. 325, 336 (1971)).

"When a jury must choose which of two opposing versions to credit, it simply cannot be said that the evidence is overwhelming." State v. Frost, 158 N.J. 76, 87 (1999). Here, the State's case rested entirely on the jury crediting J.G.'s account over defendant's denials. J.G. was the only witness who implicated defendant and was therefore the lynchpin of the State's case. Both D.G. and to a lesser extent A.G. corroborated defendant's version. During deliberations, the jury requested a playback of J.G.'s prior statement, not his trial testimony.

Whether or not the incident occurred was "a pitched credibility battle" between J.G. and defendant, which resolution would determine defendant's guilt or innocence. State v. Frisby, 174 N.J. 583, 596 (2002). Thus, "[a]ny improper influence on the jury that could have tipped the credibility scale was necessarily harmful and warrants reversal." Ibid. Under the circumstances, we are persuaded that the erroneous admission of the prior consistent statement tipped the credibility scale, unfairly bolstered the State's proofs, and improperly

23

influenced the jury. Accordingly, we are constrained to reverse defendant's convictions on this ground.

Because we are satisfied that reversal is warranted, it is unnecessary for us to address defendant's remaining points. We shall, however, briefly address them for the sake of completeness.

We agree with defendant's contention raised in Point II that it was error to admit an omission in A.G.'s prior inconsistent statement after the judge had conducted a hearing pursuant to State v. Gross, 121 N.J. 1 (1990),[12] and ruled that the prior inconsistent statement was unreliable and inadmissible. After A.G. testified that defendant was holding a Maglite rather than a gun on the day in question, the State moved to admit A.G.'s prior inconsistent statement from the August 24, 2016 competency hearing that had been conducted by a different judge. In evaluating the admissibility of the statement, the judge reviewed both A.G.'s August 24, 2016 testimony from the competency hearing and his June 19, 2014 statement elicited by Forensic Interview Specialist Nicole Ortiz.

---

[12] See Gross, 121 N.J. at 17 (requiring a hearing and consideration of certain factors to determine the admissibility and reliability of a prior inconsistent statement of a trial witness); N.J.R.E. 803(a)(1) (providing for admission into evidence of a prior inconsistent statement made "in circumstances establishing its reliability").

After reviewing both, the judge ruled that neither was admissible because they were both unreliable. The judge noted that in the June 19, 2014 interview conducted "nine days after th[e] event," A.G. was "all over the place, as to what happened or didn't happen" and the interview was "very disjointed." However, "someway or another, between June 19[], 2014 and August 24, 2016," A.G. became "a much better reporter" with an improved "ability to relate th[e] facts." The judge found the improvement "odd" and "totally inconsistent with [A.G.'s] initial interview where he really couldn't relate anything about the event." The judge was troubled by the inexplicable improvement in "[A.G.'s] memory . . . in the intervening two years" and, after applying the Gross criteria, concluded that neither statement was reliable or trustworthy. Notwithstanding this ruling, Ortiz was permitted to testify that during the June 19, 2014 interview, A.G. never mentioned seeing his father with a Maglite or a flashlight.

We agree with defendant that given the judge's ruling following the Gross hearing, it was error to permit Ortiz' testimony regarding A.G.'s omission in the June 19, 2014 interview. "'Impeachment by omission' is a recognized means of challenging a witness's credibility." Manata v. Pereira, 436 N.J. Super. 330, 344 (App. Div. 2014). "A statement from which there has been omitted a material assertion that would normally have been made and which is presently testified

to may be considered a prior inconsistent statement." State v. Provet, 133 N.J. Super. 432, 437 (App. Div. 1975). "Under appropriate circumstances, the prior inconsistent omission can be offered solely to discredit, or also as substantive evidence." Manata, 436 N.J. Super. at 344.

Here, A.G.'s omission was part and parcel of his prior inconsistent statement that had been excluded by the judge as unreliable. Thus, its admission was error. Individually, we conclude that the error was harmless, that is, it "was 'too insignificant to have had any bearing' on the trial . . . ." State v. Reid, 194 N.J. 386, 405-06 (2008) (quoting State v. Hunt, 91 N.J. 338, 350 (1982)). However, we address the issue so that the error can be avoided in any retrial.

In Point III, defendant argues "the prosecutor committed two instances of misconduct during summation" by telling the jury that the detective who recorded J.G.'s prior statement "believed J.G.'s version of events" and by accusing defendant "of tampering with [A.G.'s] testimony." Defendant asserts the prosecutorial misconduct deprived him of a fair trial.

"Prosecutors are afforded considerable leeway in closing arguments as long as their comments are reasonably related to the scope of the evidence presented." Frost, 158 N.J. at 82. "In other words, as long as the prosecutor 'stays within the evidence and the legitimate inferences therefrom,' [t]here is no

26

error." State v. McNeil-Thomas, 238 N.J. 256, 275 (2019) (alteration in original) (first quoting State v. R.B., 183 N.J. 308, 330 (2005); and then quoting State v. Carter, 91 N.J. 86, 125 (1982)).

"Reversal is justified when the prosecutor does not abide by the above strictures, and the conduct was 'so egregious as to deprive defendant of a fair trial.'" State v. Echols, 199 N.J. 344, 360 (2009) (quoting State v. Wakefield, 190 N.J. 397, 437 (2007)). "In determining whether a prosecutor's comments meet the 'so egregious' standard, a reviewing court must 'consider the tenor of the trial and the responsiveness of counsel and the court to the improprieties when they occurred.'" Ibid. (quoting State v. Timmendequas, 161 N.J. 515, 575 (1999)). "Generally, if no objection was made to the improper remarks, the remarks will not be deemed prejudicial. Failure to make a timely objection indicates that defense counsel did not believe the remarks were prejudicial at the time they were made." Timmendequas, 161 N.J. at 576 (citation omitted).

When there is no objection, on appeal, "defendant must demonstrate plain error to prevail." Ibid. "Plain error is 'error possessing a clear capacity to bring about an unjust result and which substantially prejudiced the defendant's fundamental right to have the jury fairly evaluate the merits of his defense.'" Id. at 576-77 (quoting State v. Irving, 114 N.J. 427, 444 (1989)).

A-3631-17

Here, defendant asserts that during summations, "the prosecutor bolstered [J.G.'s] credibility by telling the jury that the detective who took [J.G.'s] statement . . . believed that [J.G.] was telling the truth." According to defendant, the prosecutor also "characterized [the detective] as a skilled juvenile interviewer and an expert at ferreting out the truth, therefore implying that if such a [d]etective found [J.G.] credible then the jury should do the same."

During summations, referring to Sergeant Boulieris' testimony, the prosecutor stated:

> [Sergeant] Boulieris is a very experienced detective. A large part of his experience is dealing with juveniles. He said he worked in the Juvenile Bureau for years. He encountered juveniles in all different forms. . . . He saw the whole gamut . . . and knows how juveniles work.
>
> . . . .
>
> What was significant about . . . Sergeant Boulieris is that he interacts with everybody, taking statements from juveniles all the time. And he said he put him under oath, and <u>he said he believed his allegations</u>. . . . This is a guy, you're not going to get anything over on him. He knows juveniles. . . . <u>[H]e believed the allegation</u>. He sensed it.
>
> [Emphasis added.]

Notably, during the recorded statement, Boulieris did not state that he believed J.G. Likewise, during his testimony, Boulieris did not testify that he

28

A-3631-17

believed J.G. Indeed, such testimony would have been objectionable because "the mere assessment of another witness's credibility is prohibited." Frisby, 174 N.J. at 594. "Although prosecutors may suggest legitimate inferences from the record, they may not go beyond the facts before the jury." State v. Roach, 146 N.J. 208, 219 (1996). Stated differently, prosecutors may not "argue[] facts that were unsupported by the evidence." Id. at 220.

While the prosecutor's remarks regarding Boulieris' expertise were fair comment on the evidence, the remarks that Boulieris believed J.G.'s allegations were impermissible. The prejudice was exacerbated by the fact that the remarks were couched in terms of Boulieris' expertise in dealing with juveniles. See State v. J.Q., 252 N.J. Super. 11, 40 (App. Div. 1991) ("There is simply no scientific foundation for an expert's evaluation of the credibility of a witness or for the conclusion that [an expert] has some particular ability to ferret out truthful from deceitful testimony.").

We are mindful that defense counsel's summation forcefully attacked J.G.'s credibility. See State v. Murray, 338 N.J. Super. 80, 88 (App. Div. 2001) ("[I]n reviewing a prosecutor's summation, we must consider the context in which the challenged portions were made, including determining whether the remarks were a measured response to defendant's summation made in an attempt

to 'right the scale.'" (quoting State v. Engel, 249 N.J. Super. 336, 379 (App. Div. 1991))). Nonetheless, the prosecutor's response was inappropriate. Prosecutors "may 'strike hard blows . . . [but not] foul ones.'" Echols, 199 N.J. at 359 (alteration in original) (quoting Wakefield, 190 N.J.at 436).

Because defense counsel did not object, "defendant must demonstrate plain error to prevail." Timmendequas, 161 N.J. at 576. We are persuaded that this error in conjunction with the erroneous admission of J.G.'s prior consistent statement had "a clear capacity to bring about an unjust result" and "substantially prejudiced the defendant's fundamental right to have the jury fairly evaluate the merits of his defense." Id. at 576-77 (quoting Irving, 114 N.J. at 444). "We need not decide whether, viewed in isolation, we would conclude that this error alone required reversal of defendant's conviction[s]." State v. Jenewicz, 193 N.J. 440, 463-64 (2008). "Rather, we . . . assess the harm to defendant from this error by considering it in the context of the other error[] in defendant's trial." Id. at 464.

Defendant argues further that in summations, the prosecutor improperly "accused defendant of manipulating and tampering with A.G.'s trial testimony" as follows:

> The next witness we heard from was [A.G.] I
> think it was particularly shameful what happened with

[A.G.]  And I don't blame [A.G.]  But [A.G.] said to you it was a Maglite, my father didn't do anything wrong.  He just kind of blurted it out like that.  I would submit, ladies and gentlemen, that was coached.  That's not how a six-year-old is going to talk.  It was something that had been practiced.  And he came in, and he said it.

And I asked him, well, at some point before, you thought it was a gun, right.  And he said yes.  But then he had a realization at six years.  And I . . . questioned him a little bit more, how did that come about; well, it came about when my father told me it was a Maglite, that it wasn't a gun.  That was a shameful thing, to manipulate this child, in order to avoid responsibility for your behavior.

And ladies and gentlemen, that is the only reason why those counts are not for your consideration anymore because that testimony was altered, it was changed, it was coached.

Defense counsel objected to the comments, arguing "there was no evidence of that adduced at trial."  In overruling the objection, the judge determined that it was "fair comment on . . . facts . . . in evidence."  The judge recounted the testimony that A.G. "thought it was a gun, and then received some clarification from his dad."  As a result of the clarification, A.G. said "it was not a gun, it was a Maglite."  The judge concluded that "[a] fair inference" from those facts was that defendant "was trying to influence" A.G. to avoid culpability.  We agree.

31

In any event, the judge instructed the jury that "summations of counsel are not evidence, and must not be treated as evidence." Instead, the judge told the jurors to "rely solely upon [their] understanding and recollection of the evidence that was admitted during trial." "We presume that the jury followed the court's specific admonitions . . . ," Timmendequas, 161 N.J. at 578, and find no evidence that these comments substantially prejudiced defendant's right to a fair trial.[13]

Reversed and remanded for a new trial.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[13] The judge also instructed the jurors that counts two and five of the indictment were dismissed, and they were not to consider them as "there was insufficient evidence to . . . put th[ose] count[s] before" the jury.

A-3631-17